IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| v. : | CRIMINAL NUMBER 20-392-1 |
| SHAHIDUL GAFFAR : | |

**DEFENDANT'S SENTENCING MEMORANDUM AND
REQUEST FOR DOWNWARD VARIANCE**

Shahidul Gaffar, by and through his attorney, Elizabeth L. Toplin, Assistant Chief, Trial Unit, Federal Community Defender for the Eastern District of Pennsylvania, files this Sentencing Memorandum in support of a fair and just sentence in the above captioned case.

**I.   PROCEDURAL HISTORY**

On November 9, 2020, the United States Attorney's Office for the Eastern District of Pennsylvania filed a 1-Count Information charging Shahidul Gaffar and Nabila Khan with conspiracy to provide material support to foreign terrorist organization, in violation of 18 U.S.C. 371 and 2339B [Count 1].

On November 18, 2020, Mr. Gaffar appeared before the Honorable Joshua D. Wolson and, pursuant to a written plea agreement, waived prosecution by Indictment and pled guilty to Count 1 of the Information.

**II.   SENTENCING GUIDELINES**

A Presentence Investigation Report has been prepared by United States Probation Officer, Talia Santella. There are no objections to the report. The applicable statutory maximum sentence and guideline range is 60 months. Mr. Gaffar has no prior or subsequent criminal

record.

The offense here is a Class D Felony and as such, Mr. Gaffar is eligible for not less than one nor more than five years of probation.

As United States Probation Officer Santella noted in Part F of the Presentence Investigation Report, factors exist that may warrant a sentence outside of the advisory guidelines. Recognizing that the offense here carries a statutory maximum term of imprisonment of 60 months, Ms. Santella notes that as Mr. Gaffar is a first-time offender who is the sole provider for his wife and four young children, the Court may wish to consider a further reduction in sentence due to the devastating collateral consequences that his imprisonment will have upon his wife and four young children.

Given the particular facts and circumstances of this case, the defense suggests that a significant variance would best fulfill sentencing goals pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and the subsequent cases reaffirming its holding, and 18 U.S.C. §3553(a).  For the reasons contained herein, the defense respectfully recommends that the Court impose non-custodial sentence.

### III.   CIRCUMSTANCES OF THE OFFENSE

The circumstances of the offense are accurately summarized in the Presentence Investigation Report. Between March of 2015 and July 2015, after learning that his brother, Ibrahim Khan, had made the decision to join ISIS in Syria, Gaffar sent five money transfers to Ibrahim Khan in Bangladesh. His wife, Nabila Khan, was in Bangladesh at this time with the couple's young children while they had an extended visit with family. Ms. Khan and her children were staying in the family home which was under renovation. Ibrahim Khan was also living in

the home. Ms. Khan and her children spent the majority of their time with her sister and family, who lived nearby.

The funds that the defendant sent to Bangladesh were for various purposes. There is no dispute that the defendant was aware of his brother in law's intention to travel to Syria, and nevertheless sent funds knowing they would be used by him to facilitate his departure. Additionally, the funds were intended to provide financial support to his wife and children. Further, the money sent was, in part, as both repayment of a loan to the defendant by Ms. Khan's father, as well as a return of tuition money that Gaffar had been holding for Ibrahim Khan.

Ibrahim's decision to travel to Syria and join ISIS caused tremendous discord among the family. His older brother, Junaid, had previously joined ISIS and the family had not seen him again. Ibrahim by contrast, had been attending college in the United States and demonstrated no such sympathies. After a devastating romantic breakup caused him to become depressed, withdraw from family, quit college, and eventually return to Bangladesh, the family became concerned about his emotional wellbeing. The renovations to the family home were undertaken in the hopes that Ibrahim would marry and begin a family of his own. The family believed that a beautiful home would enhance Ibrahim's status in terms of marital prospects, and thus encourage him to remain there. Ms. Khan encouraged the defendant to return the money that had been lent years prior by her father to support Gaffar's struggling business. Instead, Ibrahim continued to withdraw and spend time away from family. He pressured his sister, Ms. Khan, to encourage the defendant to return her father's money as well as the tuition money Gaffar still held. He exploited her embarrassment that her husband had been financially insecure enough to borrow family money. The defendant and his wife were distressed by his behavior and horrified by his decision to join ISIS. Gaffar tried to talk him out of going. The concern and urging of the family

was met with anger and hostility by Ibrahim; the more the family urged him to reconsider, the more he pulled away from them or lashed out. The family was so distressed that Ibrahim was leaving and by his anger and distance, they did all they could to maintain harmony during this chaotic time. The criminal conduct in this case occurred during this period of familial angst and discord.

Mr. Gaffar and Ms. Khan had no contact with either of her brothers after they left to go to Syria. They learned through Ms. Khan's mother that Ibrahim quickly regretted his decision and wanted to return to Bangladesh. Unfortunately, he was unable to leave and ultimately jailed by ISIS. The family later learned that Ibrahim was killed in a drone strike.

Mr. Gaffar has admitted his criminal conduct. The foregoing explanation does not seek to minimize his conduct or rationalize his decision to engage in the activity; rather, it is offered to provide context and explanation to the crime and unique circumstances.

IV.    **PERSONAL HISTORY OF SHAHIDUL GAFFAR AND OTHER SENTENCING CONSIDERATIONS**

Shahidul Gaffar was born on November 26, 1979, in Bogra, Bangladesh. He is one of four children born to the marital union of Abdul Gaffar and Samsun Nahar Gaffar. The defendant's parents are both naturalized United States Citizens who currently reside in Bangladesh. The defendant's siblings all reside in the United States. His older sister is a homemaker in California; his younger sister resides in Clifton Heights, Pennsylvania and is a student at Albright College. The defendant's brother lives with his family in Philadelphia and operates a restaurant specializing in Indian food. The defendant shares a close relationship with his family, especially his brother. He and his brother see each other regularly and the defendant assists his brother with his restaurant.

Shahidul Gaffar was raised by both parents in Bangladesh. His father maintained employment as a teacher and his mother was a homemaker. The defendant recalls a happy, humble childhood and describes his family's economic status as "middle class".

The defendant's life changed forever in 1992, when he was 12 years old, when he was the victim of an accidental electrocution. A live electrical wire fell on his head at his home in Bangladesh. He grabbed the wire with his hands and his body caught fire. He was knocked to the ground, unconscious and suffered devastating burns over more than 40 percent of his body. He was told by responders that when they arrived his body was stuck to the floor. He was rushed to a local clinic but was refused treatment due to the nature and severity of the injuries. A family friend had a contact at a larger government hospital some distance away and he was taken there and admitted. His prognosis was dire and at least one point during his ordeal, he was pronounced dead and revived by medical personnel. The defendant spent more than six months in the hospital recovering from his injuries. He required skin grafts over multiple areas of his body and had to relearn various functions related to body movement, hand use and walking. While he made miraculous progress against all odds, he was left with physical disabilities, disfigured with scars and without hair which had been burned away.

In 1992, the defendant's father won the "visa lottery" and was granted permission to bring the family to the United States. He chose to relocate to Baltimore, Maryland because of the high level of accessible medical care. The defendant began to receive treatment at the Johns Hopkins Hospital where he underwent several more surgeries and skin grafts over the next few years.

Upon his arrival in the United States, the defendant did not speak English. He recalls that the cultural differences he experienced were "difficult" and the "language barrier was tough."

Nevertheless, he was a bright student and quickly learned English, in part through a television cartoon. He was enrolled in high school at Baltimore Polytechnic Institute and graduated successfully on June 7, 1998. During his high school years, he was an excellent student and participated in athletics and various extra curricular programs.

After graduating from high school, the defendant continued his education and enrolled in Towson University in Towson, Maryland. Due to his own medical experiences, the defendant initially planned to pursue a career as a physician; however, during this time the computer field was booming, and the defendant thought that it would be a positive career path. Hence, he pursued a career in the computer field and obtained a Bachelor of Science in computer information systems in 2002. After graduating he had a difficult time securing employment in his field and decided to pursue an advanced degree. He attended Towson from 2002 to 2004 while he pursued a Master of Science degree in applied information technology. While attending graduate school, the defendant participated in a graduate internship program in which he received a scholarship stipend in exchange for being a student advisor.

In 2000, the family had purchased a home and move to Clifton Heights, Pennsylvania. The defendant's father had purchased a dollar store and asked the defendant for help running the business. The defendant began traveling between Maryland and Pennsylvania working and attending classes. Eventually the defendant moved permanently to Pennsylvania and began to work with his family while looking for business opportunities.

During this time, Mr. Gaffar was introduced by family to his wife, Nabila Khan. Theirs was an arranged marriage which took place in August 2005 in Bangladesh. The defendant was able to bring Ms. Khan to the United States in 2006, and the couple resided in an apartment in Upper Darby, Pennsylvania. In describing his relationship with his wife, Mr. Gaffar explains

"She was a dream come true for me…She gave me confidence" He explained that after his accident, his scars and disabilities caused him deep insecurities. His marriage and his wife helped him to overcome his self-consciousness. He describes, "I found a gem…so precious. I am a devoted husband…she is my second miracle." "Every day of my life is a miracle. I can't hurt anyone. My life is gifted…Every day is a gift."

After bringing his wife to the United States, the defendant decided to purchase a restaurant in King of Prussia, Pennsylvania. He paid cash for his share of the business, much of which he borrowed from family. Initially the business was successful, though the defendant was working long hours, seven days a week which kept him from his growing family. Eventually he learned that his business partner was dishonest and was taking advantage of the defendant financially. He decided to terminate his interest in the business which cost him approximately $130,000 and thrust the family into greater financial stress and uncertainty. From approximately 2006 to 2011, he was uninvolved in the business.

To support his family, the defendant secured various short-term positions but still struggled financially. He felt that he couldn't adequately provide for his wife and children and they returned temporarily to Bangladesh while he considered other employment options. In 2011, he decided to put his experience to use again in the restaurant industry and bought back his restaurant, Deshi Village, in King of Prussia. Eventually he downsized the business and moved it to its current location in Collegeville, Pennsylvania. Early in the pandemic, the defendant was forced to close his business temporarily. He subsequently reopened for takeout, and recently for indoor dining, but his business has suffered dramatically.

The defendant and his wife have four young children. Ms. Khan is a homemaker and cares for the children. Theirs is a traditional marriage by their Bengali cultural standards. She has

7

never worked and has no professional licenses. She does not know how to drive and relies on the defendant for housing, food shopping, other necessities, and transportation. She, as is customary, does not go places by herself, or have any male friends and would generally not be in the presence of men unless accompanied by her husband. The family lives in a rented home and has no savings.

During the pendency of this case, Mr. Gaffar has remained positive and determined to maintain his business and social relationships and to support his family. Unfortunately, a press release issued by the United States Attorneys Office following the plea quickly spread through the Bengali community in the United States and in Asia. Various newspapers picked up the story and Mr. Gaffar, Ms. Khan and the children were inundated with negative attention. Most of their social network turned away from them. Many of Mr. Gaffar's business associates abandoned him. A bank with which he was dealing stopped doing business with him. Their families in Bangladesh have been both harassed and shunned. Mr. Gaffar's brother, who resides in Philadelphia, remains a constant source of emotional support. However, he is in no position to assist the family financially.

The defendant and the couple's four children are United States citizens. Ms. Khan is subject to deportation due to her status as a legal permanent resident. She will most certainly be deported following the satisfaction of any sentence. Both of her brothers are deceased; her father also died suddenly last year. While her sister and ailing mother live modestly in Bangladesh, they do not have the resources to provide for Ms. Khan. Given the nature of the offense, implications and political uncertainty, Ms. Khan fears for her own safety in her home country. Mr. Gaffar and Ms. Khan must choose between uprooting their children from their home in the United States where they have an opportunity for education, friendships, and success, to send

them to Bangladesh when Ms. Khan is deported or having them remain in the United States without their mother. Mr. Gaffar has no business opportunity in Bangladesh, yet if he remains here, he will be separated from his wife. The collateral consequences of the defendants' crimes have been, and will continue to be, devastating to the family. In short, they have been, and will continue to be punished enough. Their punishment will go on far longer than any sentence the Court might impose.

      Mr. Gaffar does not seek to justify or minimize his actions and he is well aware of the seriousness of his crimes. However, he has clearly demonstrated post offense rehabilitation. He has demonstrated that the crime at issue is truly anomalous to an otherwise law-abiding life and that he can successfully compart himself in society. The crime in this instance occurred during a uniquely difficult and time in his life, and the lives of his family, and he relinquished and renounced his criminal activity on his own, long before he was ever approached by law enforcement.

      The Court must also consider the sentences of other individuals who have been convicted of similar crimes. Defendants convicted of far more egregious behavior have received sentences below the guidelines and stat max here. In the case of *United States v. Jasminka Ramic*, Crim. No. 4:15-cr-00049-CDP-6, ECF No. 253 (E.D.Mo., Jan. 5, 2016) Ms. Ramic pled to 18 U.S.C. § 371 and was sentenced to 36 months jail followed by 3 years of supervised release. The facts in Ms. Ramic's case are far more alarming. Ms. Ramic was a follower of Abdullah Pazara, a Bosnian-American who traveled to Syria to fight on behalf of ISIS. Ms. Ramic financially supported Pazara knowing that the money provided would be used by him to facilitate his efforts against the Syrian government. In fact, the moneys were used for tactical equipment and weapons.

In the case of *United States v. Shannon Conley*, Crim. No. 1:14-cr-00163-RM-1, ECF No. 79 (D.Colo., Jan. 26. 2015) Ms. Conley pled to 18 U.S.C. § 371 and 2339B. Ms. Conley pled guilty to attempting to travel to Syria to join and provide support for Al Quaeda/ISIS. Ms. Conley met her fiancée, a jihadi fighter, online and shared his belief in violent jihad. She planned to join him and the terrorist group and arranged to have training in weapons and tactics. She was arrested as she was preparing to board a flight to Turkey. Again, the circumstances in Ms. Conley's case are far more nefarious than the conduct of Mr. Gaffar.   Ms. Conley was sentenced to 48 months jail and 3 years supervised release

Mr. Gaffar understands that the severity of the crime weighs heavily for this Court. Respect for the law and the seriousness of the offense must be a consideration for the Court. Ms. Gaffar also understands that the Court must consider the need for a general deterrence to others considering such offenses.   The base offense level and severe guideline range certainly serve as a deterrent to others.   The collateral consequences that this family will suffer will also serve as a deterrent. Arguably, a far greater deterrent than a jail sentence of 60 months or less.

The unique circumstances in this case, warrant a comparably unique disposition. At no point in this process has Mr. Gaffar failed to internalize the consequences of his acts. A non-custodial sentence would not mean that the seriousness of the offense would be diminished or that the Court would be promoting a lack of respect for the law or otherwise failing to mete out just punishment, but rather acknowledge the unusual circumstances of this case.

## VI.     CONCLUSION

Based on the above stated reasons, the defense respectfully requests that this Court grant a variance below the advisory guideline range and impose a non-custodial sentence.

Respectfully submitted,

_____
ELIZABETH L. TOPLIN
Assistant Chief, Trial Unit

## CERTIFICATE OF SERVICE

I, Elizabeth L. Toplin, Assistant Chief, Trial Unit, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I caused a copy of the attached Defendant's Sentencing Memorandum and Request for Downward Variance via Electronic Case Filing upon Sarah Wolfe and Robert Livermore, Assistant United States Attorneys, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania, 19106.

_____
ELIZABETH L. TOPLIN
Assistant Chief, Trial Unit

DATE:   September 20, 2021